UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURIANNE MASKE,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | )<br>)<br>)<br>)   No. 10 C 7401<br>)<br>)   Judge Ruben Castillo<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Laurianne Maske brings this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Maske's application for Supplemental Security Income and Disability Insurance Benefits. (R. 1, Compl.) Presently before the Court is Maske's motion for summary judgment seeking a remand for further proceedings. (R. 16, Pl.'s Mot. for Summ. J.) For the reasons stated below, Maske's motion is granted.

## RELEVANT FACTS[1]

Maske was born on July 27, 1958. (A.R. 161.) She has a high school education and two years of college. (A.R. 46.) Prior to October 2004, Maske worked as a cleaner of computer parts, assembler, and machine operator. (A.R. 46-47.) Her position required her to lift 20-25 pounds for approximately two hours in an eight-hour day. (A.R. 47.) She stopped working in 2004 after suffering a repetitious injury to her left arm. (A.R. 45.) After the injury, her physician released her for light duty, but her employer had no light duty positions available. (A.R. 49.)

---

[1] Citations to (R.) refer to the record number that a document is assigned on the docket for this case. Citations to (A.R.) refer to the administrative record of these proceedings, which was filed as R. 13 on the docket.

Maske applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on December 5, 2006.[2]

## I.    Medical Evidence

Maske contends that she is unable to work due to a variety of conditions, including chronic degenerative disc disease, osteoarthritis, nerve damage in her left arm, diabetes, tachycardiarthmia, hypertension, and depression. (A.R. 203.) Maske has been treated for left shoulder, right knee, left arm, elbow, wrist and hand pain, diabetes, hypertension, bilateral renal calculi, musculoskeletal back pain, obesity, gastroesophageal reflux disorder ("GERD"), anxiety, and depression. Maske's primary caregivers have been Dr. Paul Perona, an orthopedic surgeon, and Dr. Richard Twanow.

In April and May 2004, Maske sought treatment from Dr. Perona for left wrist and back pain. (A.R. 308-09, 316-17.) She had an MRI of her cervical spine, which revealed a moderate disc herniation and congenital narrowing of the cervical spinal canal. (A.R. 316.) In addition, an EMG and nerve conduction velocity exam revealed mild left carpal tunnel syndrome and evidence of a left ulnar nerve entrapment. (A.R. 308.)

In September 2004, Dr. Perona treated Maske for knee pain. Dr. Perona prescribed an MRI to examine the internal structures of Maske's right knee. (A.R. 306.) Dr. Perona diagnosed mild degenerative joint disease and recommended a cortisone injection and quadriceps strengthening exercises. (A.R. 305.) He cleared her to return to regular job duties. (*Id.*)

The next month, Maske returned to Dr. Perona because of pain in her left wrist and elbow. Maske complained of limited mobility and numbness and tingling in her fingers that had

---

[2] Maske previously filed applications for DIB and SSI that were initially denied, but she has not appealed those decisions or sought to have them reopened.

2

not abated since her May 2004 treatment. (A.R. 350-51.) Dr. Perona reviewed two prior EMG and nerve conduction velocity exams. (*Id.*) He observed mild to moderate bilateral median neuropathy at the left wrist and an ulnar nerve entrapment at Guyon's canal. (A.R. 351.) As a result, Dr. Perona diagnosed her with left elbow cubital tunnel syndrome. (*Id.*) He recommended left ulnar nerve decompression surgery and expected that she would miss six to eight weeks of work while she recovered from surgery. (*Id.*) In November, Dr. Perona performed a cubital tunnel release and ulnar nerve transposition, but Maske's numbness, tingling, and pain did not decrease. (A.R. 327.) He performed the nerve decompression surgery in December 2004. (A.R. 327-28.)

During the first few months of 2005, Maske reported ongoing pain in her left arm. (A.R. 335-38.) Dr. Perona cleared her to return to work post-surgery only if she could refrain entirely from using her left arm. (A.R. 335-36.) During a March 2005 physical therapy session, she reported lingering pain in her left arm that spiked to an eight on a ten-point scale. (A.R. 323.) She also reported to Dr. Perona that she occasionally felt jabs of pain when grasping objects. (A.R. 332.) Dr. Perona referred her to a neurologist to determine the ongoing source of pain in her left arm. (*Id.*) In June 2005, Maske suffered continued left hand and elbow pain. (A.R. 331.) She also began experiencing left shoulder pain. (*Id.*)

In September 2005, Maske returned to Dr. Perona complaining that her left shoulder pain had increased in severity and begun to limit her. (A.R. 329.) Dr. Perona believed that Maske was suffering from a left shoulder subacromial impingement and acromioclavicular joint degeneration. (*Id.*) A December 2005 MRI confirmed a subacromial impingement, and a physical exam suggested possible instability. (A.R. 302.) As a result, Dr. Perona recommended

3

physical therapy for Maske, but believed that surgical intervention would be required if she did not improve within a month. (*Id.*) Dr. Perona cleared Maske to return to light work duties with absolutely no overhead work. (*Id.*) In January 2006, Dr. Perona performed a left shoulder arthroscopy. (A.R. 325-26.)

Two months later, in March 2006, Maske continued to experience shoulder pain. (A.R. 300.) She reported pain, weakness, and numbness in her left arm. (*Id.*) Dr. Perona diagnosed Maske with possible thoracic outlet syndrome and recommended that she see a thoracic outlet specialist if the pain worsened. (*Id.*) He recognized that her left shoulder and arm injury was a "permanent disability and restriction," and encouraged her to apply for disability. (*Id.*)

In July 2006, Dr. Twanow completed forms documenting Maske's medical condition after she applied for social security benefits. (A.R. 440-46.) Dr. Twanow reported that Maske had chronic radicular pain in her left arm and numbness and weakness in her left hand. (A.R. 441, 443.) He also noted tenderness in her left shoulder and chronic pain in her left arm, which limited her use of the left arm. (*Id.*) He reported that the problems with her left arm had not responded to treatment. (A.R. 446.) Dr. Twanow reported that Maske could lift or carry up to ten pounds with her unoccupied upper extremity, did not need to change positions more than once every two hours, and did not have any gait abnormalities. (A.R. 441-42.) He also stated that Maske's response to treatment was weak or guarded, but that she did not have any side effects of treatment. (A.R. 442.)

In August 2006, Dr. Michael Nenaber, a state agency physician, conducted a review of the record to complete a physical residual functional capacity ("RFC") assessment. (A.R. 495.) He concluded that Maske could perform light exertional work with occasional postural

4

limitations, and that Maske had no manipulative limitations. (A.R. 496-98.)

In September 2006, Dr. Twanow wrote a letter in which he reported that he had treated Maske for hypertension, bilateral recurrent renal calculi, Type 2 diabetes, GERD, and an anxiety disorder and depression. (A.R. 529.) He opined that Maske was "significantly disabled" due to these illnesses. (*Id.*) He also highlighted her musculoskeletal problems, and noted that she had suffered significant pain in her arm and shoulder since February 2003, had seen both a neurosurgeon and orthopedic surgeon, and had numerous investigations and surgeries. (*Id.*) He stated that the procedures were not successful in relieving her pain and "returning her arm and shoulder to normal function," that "[t]here is no doubt that Ms. Maske is permanently disabled," and that "the disability associated with her left shoulder and arm is an important part of that disability." (A.R. 529-30.) He stated that it was difficult for him to apportion how much of her disability is related to a work-related injury and how much of it is related to her degenerative disc disease and arthritis in her neck and lumbar spine. (A.R. 529.) He commented that her diabetes was under control. (A.R. 530.)

In October 2006, Dr. Twanow wrote another letter that reiterated and expanded upon his previous opinions. (A.R. 528.) In the letter, he stated that Maske has a history of "incapacity related to pain and difficulty in using her left arm and shoulder." (*Id.*) He opined that Maske is not ready to return to work because of the chronic pain in her left arm. (*Id.*) He wrote that Maske has "reached her maximum medical improvement" and that there are not any further interventions that will improve her condition. (*Id.*) He also stated that Maske has been compliant with her physical therapy program. (*Id.*)

5

Maske's pain continued throughout 2007. Dr. Perona noted the persistence of pain in her wrist in January 2007. (A.R. 717.) He also noted a positive Adson test, left upper extremity thoracic outlet syndrome, and a recurrent ganglion cyst on Maske's right wrist. (*Id.*) He advised treating both the thoracic outlet syndrome and ganglion cyst conservatively. (*Id.*) A few weeks later, Dr. Twanow consulted with Dr. Perona about Maske's chronic arm pain and recommended an evaluation for thoracic outlet syndrome. (A.R. 718.)

In February 2007, Dr. Twanow informed Maske that she would have to begin an insulin regime. (A.R. 722.) That same month, Dr. Phillip Budzenski performed a consultative exam on Maske. (A.R. 585-591.) Dr. Budzenski observed limited range of motion in Maske's cervical and dorsolumbar spine. (A.R. 587-88.) These limitations included Maske's ability to raise her legs in the seated and supine positions. (A.R. 588.) Dr. Budzenski further observed that Maske's ability to extend and rotate her arms was limited. (*Id.*) He observed mild to moderate tenderness in her left elbow. (*Id.*) Dr. Budzenski tested Maske's grip strength and found it to be normal. (*Id.*) He also found no gait or ambulatory abnormalities. (A.R. 589.) Dr. Budzenski diagnosed Maske with hypertension that was fairly controlled with medication, Type 2 diabetes that was uncontrolled because Maske was prescribed insulin replacement, decreased range of motion in the left shoulder, left elbow tenderness consistent with left lateral epicondylitis, and obesity. (*Id.*) Based on his examination, Dr. Budzenski concluded that Maske could not do overhead work with her left upper extremity, but that she could do light grasping, pushing, and pulling with her right arm, with fine fingered manipulations with both hands. (A.R. 590.) He also concluded that she should not climb ladders, ropes or scaffolding. (*Id.*)

6

In March 2007, a state agency physician, Dr. Towfig Arjmand, reviewed Maske's medical records and completed an RFC assessment. (A.R. 592-99.) Dr. Arjmand noted that Maske's left arm and shoulder problems created some limitations. (A.R. 593-95.) He concluded that Maske could occasionally lift up to twenty pounds, frequently lift up to ten pounds, and sit or stand for about six hours in an eight-hour workday. (A.R. 593.) He stated that Maske should not climb ladders, ropes or scaffolding, and that she could only occasionally reach overhead with her left upper extremity. (A.R. 593-96.) In addition, Dr. Arjmand believed that Maske should avoid concentrated exposure to hazards. (A.R. 596.) A second state agency physician, Dr. Sandra Bilinsky, reviewed and agreed with Dr. Arjmand's findings in June 2007. (A.R. 708-09.)

In April 2007, Maske was hospitalized for over a week for intractable back pain. (A.R. 724-41.) Dr. Twanow treated Maske during her hospitalization, and an MRI revealed "severe" degenerative disc disease, disc bulges and narrowing of the neural foramina in her lumbar spine. (A.R. 725-28, 731.) At this time, Dr. Twanow's assessment of Maske notes: (1) intractable lower back pain with radicular pain down the right lower extremity associated with widespread degenerative disc disease at multiple levels; (2) Type 2 diabetes; (3) depression; (4) hypertension; (5) GERD; (6) myofascial pain syndrome; (7) left upper extremity thoracic outlet syndrome; and (8) history of peptic ulcer. (A.R. 731.) She received epidural steroid injections and prescription medication for pain. (A.R. 743, 746.)

By December 2007, Dr. Twanow observed that Maske's diabetes was controlled with insulin, her anxiety and depression were stable, her GERD was stable, and that her chronic lower back pain was responding to conservative therapy. (A.R. 762.)

7

Shortly before the Maske's November 2009 hearing, Dr. Twanow submitted a letter on her behalf. (A.R. 713.) In the letter, Dr. Twanow summarized the conditions for which he had treated Maske, listed the medications in her medical regime, and noted that she was compliant with her medical regime but that she has multiple allergies and difficulty tolerating certain anti-inflammatory medications. (*Id.*) He stated that she "has chronic myofascial back pain and that her activity even including activities of daily living is limited." (*Id.*) He concluded by opining that Maske was "significantly disabled and . . . unable to be gainfully employed in any significant capacity" and that her disability is "chronic." (*Id.*)

## II.    The ALJ Hearing

On December 5, 2006, Maske filed for DIB and SSI, alleging disability beginning on October 18, 2004. (A.R. 11.) Her claims were initially denied on March 21, 2007, and upon reconsideration on May 9, 2007. (*Id.*) Maske then requested a hearing before an ALJ. (*Id.*) The hearing took place on November 17, 2009, in Peru, Illinois. (*Id.*) At the hearing, the ALJ heard testimony from Maske and Edward F. Pagella, a vocational expert.

During the hearing, Maske testified that she suffered from chronic fatigue and pain. (A.R. 53.) She said that she does not take any pain medication except for ibuprofen "once in a while" because of her GERD and the life threatening side effects she has experienced from pain medications in the past. (A.R. 50.) She testified that because of the pain in her hands, arm, and back, she was unable to do any kind of lifting. (A.R. 55.) She described her pain as a seven or eight out of ten on an average day, and stated that she had constant pain, and that the pain had caused her to be hospitalized. (A.R. 56.) According to Maske, she could not walk more than a half a block without experiencing significant pain. (A.R. 53.) She also testified that it is painful

8

for her to bend forward, and that she has difficulty grasping objects. (A.R. 65, 76-77.) She also stated that she has difficulty sleeping and naps throughout the day. (A.R. 65, 74-75.)

Maske testified that she was unable to do any chores in the house or tie her shoes because she could not bend over. (A.R. 54.) She said that she occasionally folds laundry while seated, does the dishes with intermittent breaks, and "tr[ies] to help" around the house. (A.R. 61-62, 70-71.) Maske stated that she could only sit or stand for twenty minutes before she needed to lie down. (A.R. 59.) Maske also testified that she does not drive anymore because it causes her too much pain, although she drove the previous month to pick up her medications when no one was available to drive her. (A.R. 61, 69.)

At one point in the hearing, the ALJ questioned Maske's claim that her husband performed all of the household chores and management. (A.R. 63.) The ALJ noted that Maske had testified that her husband was disabled and wondered why he could manage the house but could not perform any job. (*Id.*) Maske explained that his limitations were mental and not physical. (A.R. 63-64.)

The vocational expert, Ed Pagella, testified next. (A.R. 78.) The ALJ asked Pagella to assume a hypothetical individual who could perform only light work, with no ropes, ladders, or scaffolds, who was limited to occasional overhead reaching with her non-dominant upper extremity, and who needed to avoid concentrated exposure to hazards. (A.R. 79.) The ALJ asked Pagella what jobs such a hypothetical individual could perform, and Pagella testified that the individual could perform Maske's past relevant work as an assembler. (A.R. 79.)

The ALJ then added a further restriction to the hypothetical, asking what jobs were available if the hypothetical individual were further limited to occasional postural activities,

9

meaning bending, squatting, stooping, climbing, or kneeling. (*Id.*) Pagella stated that his answer would not change. (A.R. 80.) Pagella stated that the occupation of an assembler requires the individual to be able to keep up persistence and pace throughout the course of the workday, and requires the use of the bilateral upper extremities to complete work-related tasks. (A.R. 81.) According to Pagella, if an individual is off task more than fifteen percent of a day, the position would not be available to her. (A.R. 82.)

Maske's counsel added a further restriction to the hypothetical, asking what jobs were available if the hypothetical individual were limited in her ability to reaching forward. (A.R. 84.) Pagella testified that the individual could not perform the work of an assembler, but could perform light exertion work where reaching was not an important task, such as hostess, information clerk, or messenger. (A.R. 84-85.) These jobs, however, require the ability to stand six out of eight hours throughout the course of the day. (A.R. 85.) Pagella testified that if a hypothetical individual could not stand for six hours out of an eight-hour shift, she could not perform such jobs. (A.R. 85.) Pagella stated that there is no substantial gainful activity available for an individual who is at the sedentary level of physical tolerance, who does not have the ability to stand for six out of eight hours, and can only use her bilateral upper extremities on an occasional basis. (A.R. 86.)

## III.   The ALJ's Decision

On December 7, 2009, the ALJ concluded that Maske was not disabled from October 18, 2004, the alleged onset date, through the date of his decision. (A.R. 28.) In reaching this conclusion, he evaluated Maske's claim under the five-step analysis required to evaluate a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. At step one, he concluded that Maske met the

10

insured status requirements through September 30, 2009, and had not engaged in substantial gainful activity since October 18, 2004. (A.R. 17.) At step two, the ALJ concluded that Maske had the severe impairments of osteoarthritis in her left arm and shoulder and a degenerative disc disease in her lumbar spine. (*Id.*) The ALJ found that her cubital tunnel syndrome, GERD, hypertension, diabetes, depression, and other medical conditions did not reach the required level of severity. (A.R. 17-18.) At step three, the ALJ concluded that Maske's impairments did not individually or collectively meet or equal a listed impairment. (A.R. 19.)

Based on the record before him, the ALJ next concluded that Maske retained the RFC to perform light work with certain limitations regarding the use of her left arm and shoulder.[3] (*Id.*) Specifically, the ALJ found that Maske had the RFC to perform light work, that she could occasionally reach overhead with her left upper extremity and could occasionally engage in postural activities, but that she could not climb ladders, ropes or scaffolds and must avoid concentrated exposure to hazardous circumstances. (*Id.*) In reaching this conclusion, the ALJ found that the objective medical evidence indicated that Maske's impairments could reasonably be expected to cause her alleged symptoms. (A.R. 23.) Nevertheless, he concluded that Maske's statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible. (*Id.*)

In support of his credibility finding, the ALJ found that Maske's testimony "was at best inconsistent and at times misleading." (A.R. 24.) According to the ALJ, Maske's explanations regarding her previous work, the side-effects of her current medications, her ability to drive and use her hands, and who completes household chores in her home shifted over the course of her

---

[3] The RFC is the most that a claimant can do despite the effects of her impairments. 20 C.F.R. § 404.1545(a).

11

testimony. (*Id.*) Additionally, despite Maske's claim that she had to change positions every twenty minutes, the ALJ noted that she was able to sit at the hearing for forty minutes and then take a one-minute break and then sit for an additional thirty-four minutes. (*Id.*) He also noted that Maske did not follow through with prescribed pain medication or physical therapy. (A.R. 25.) Although he noted that the opinions of Maske's treating physicians were consistent with Maske's testimony, the ALJ did not give the opinions controlling weight because he found that they were not supported by an explanation of the specific functional limitations caused by Maske's impairments, and were not consistent with the objective medical evidence and the other evidence of record. (A.R. 26.)

Finally, the ALJ concluded that based on an RFC of light work with certain limitations regarding the use of her left arm and shoulder, Maske could perform her past work as an assembler. (A.R. 27.) The ALJ also made alternative findings that given Maske's RFC, she could perform the occupations of hostess, information clerk, and messenger. (A.R. 28.) Because Maske was therefore capable of "making a successful adjustment to other work that exists in significant numbers in the national economy," the ALJ determined that Maske was not disabled as defined in the Act from October 18, 2004, through the date of the ALJ's decision, December 7, 2009. (*Id.*)

Maske sought review of the ALJ's decision on February 10, 2010. (A.R. 7.) The appeals counsel denied Maske's request for review, (A.R. 2), and the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. On November 17, 2010, Maske filed this action seeking judicial review by this Court. (R. 1, Compl.)

## LEGAL STANDARD

12

In reviewing the ALJ's decision, the Court is limited to determining whether the ALJ's decision is "supported by substantial evidence and based on the proper legal criteria." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). To determine whether substantial evidence exists, the Court "reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's 'by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility.'" *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (quoting *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999)). The ALJ does not need to mention every piece of evidence but must establish an "accurate and logical bridge" between the evidence and her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). In reviewing the ALJ's conclusions, the Court "will 'conduct a critical review of the evidence,' considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and 'the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.'" *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). However, if the ALJ's decision is supported by substantial evidence, "it will be upheld even if an alternative position is also supported by substantial evidence." *Scheck*, 157 F.3d at 699 (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

## ANALYSIS

To be eligible for disability benefits, a claimant must establish that he is "disabled" under the Social Security Act. 42 U.S.C. § 423(a)(1)(F.) The Act defines a disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

13

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A.) Under the Act, a claimant is disabled only if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* § 423(d)(2)(A.) Additionally, to receive disability benefits, a claimant must prove that he was disabled on or before the date his insured status expired. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

The Social Security Regulations ("SSRs") set forth a sequential five-step analysis to evaluate a claim of disability. *Craft*, 539 F.3d at 673-74 (citing 20 C.F.R. § 404.1520 (DIB); 20 C.F.R. § 416.920 (SSI)).[4] First, the ALJ must consider whether the claimant is engaging in substantial gainful activity. *Id.* If the claimant is engaging in substantial gainful activity, she is not disabled. *Id.* Second, the ALJ must evaluate whether the claimant's impairment is severe, medically determinable, and meets a durational requirement. *Id.* Third, the ALJ compares the claimant's impairment to a list of impairments that are considered conclusively disabling; if the impairment meets or medically equals one of the listed impairments, then the claimant is considered disabled. *Id.* Fourth, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses a claimant's RFC and ability to engage in past relevant work. *Id.*

---

[4] Because the processes of evaluation for DIB and SSI are virtually identical in all respects relevant to the case, the Court will cite only to the DIB sections, found at 20 C.F.R. § 404.1501 *et seq.* The parallel SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*

14

If a claimant can engage in past relevant work, she is not disabled. *Id.* Fifth, if the claimant is unable to engage in past relevant work, the ALJ assesses the claimant's RFC, as well as her age, education, and work experience to determine whether the claimant can engage in other work. *Id.* If the claimant can engage in other work, she is not disabled. *Id.* The claimant bears the burden of proving steps one through four, and the burden shifts to the Commissioner to prove step five. *Briscoe,* 425 F.3d at 352.

In this case, as discussed above, the ALJ found that Maske was not disabled because she could engage in past relevant work. Maske raises a number of arguments in support of her claims that the ALJ committed reversible error. Specifically, she contends that: (1) the ALJ failed to give appropriate weight to the medical opinions of her treating physicians in determining her RFC; (2) the ALJ erred in its credibility determinations; and (3) the ALJ erred in his questioning of the vocational expert.

## I. The ALJ's consideration of Maske's treating physicians' opinions

Maske first objects to the ALJ's treatment of the opinions of her treating physicians, Drs. Twanow and Perona, which supported her testimony that she suffers from chronic pain and other symptoms that restrict her ability to work. (R. 17, Pl.'s Mem. at 12.) A treating physician's opinion that is "well-supported" and "not inconsistent with other substantial evidence" in the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2); *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011). An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection. 20 C.F.R. § 404.1527(d)(2); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011). Nevertheless, a statement from a treating physician that a claimant is "disabled" or "unable to work" is not a medical opinion, but rather an

15

administrative finding, and is therefore entitled to no such weight. 20 C.F.R. § 404.1527(e)(1); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work. . . . The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled.") (internal citations omitted).

Maske contends that the ALJ failed to adequately justify discounting the opinions of Drs. Twanow and Perona. (R. 17, Pl.'s Mem. at 13.) Specifically, she points the Court to the ALJ's rejection of her treating physicians' statements that she suffers from "chronic pain, which is a [debilitating] work condition," that she is "chronically disabled," and that she has "permanent work restrictions because of her thoracic outlet syndrome." (*Id.* at 12-13.) She also argues that the ALJ improperly "picked apart the record in minor ways to diminish the opinion of Dr. Twanow[.]" (*Id.* at 13.)

The opinions that Maske contends the ALJ improperly disregarded fall in two categories. In the first category are the bare conclusions by Drs. Twanow and Perona that Maske was "disabled." The ALJ properly did not give any special significance to these opinions. As previously discussed, whether Maske was "disabled" is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d).

The second category of opinions in the record are "medical opinions," meaning statements by Drs. Twanow and Perona regarding "the nature and severity of [Maske's] impairment(s), including symptoms, diagnosis and prognosis, what [Maske] can still do despite impairment(s), and [Maske's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). These opinions include statements by Drs. Twanow and Perona indicating that Maske's left arm

16

and shoulder did not have normal functioning capabilities, that Maske still suffered pain despite several procedures and interventions, that Maske possibly suffers from thoracic outlet syndrome and that it is a permanent restriction, and that her degenerative disc disease was "severe" and "widespread."

The ALJ did not give these opinions of Drs. Twanow and Perona controlling weight because "neither even attempt to state specific functional limitations caused by the claimant's impairments" and their opinions were "not consistent with the objective medical and other substantial evidence of record," aside from Maske's "subjective complaints." (A.R. 26.) Although the ALJ stated that he "duly considered" these opinions, the Court concludes that neither explanation sufficiently justifies discounting the opinions in determining Maske's RFC.

Regarding the ALJ's first stated grounds for discounting the opinions, the only specific functional limitation identified by Maske's treating physicians was a restriction on her ability to use her left arm, particularly to reach overhead, and therefore the ALJ's observation was largely accurate. Although Maske stated that her degenerative disc disease is the impairment that most limited her ability to function, neither of Maske's treating physicians ever stated that Maske's back pain created a special functional limitation, such as needing to change positions frequently or being unable to stand or sit for long periods of time. That is not to say, however, that the treating physicians' failure to identify the specific functional limitations caused by Maske's impairments justifies discounting their statements regarding the impairments and the symptoms they cause. Thus, there is no "logical bridge" between the absence of opinions by Drs. Twanow and Perona regarding Maske's functional limitations and the ALJ's conclusion that their other opinions should be discounted.

17

Second, although the ALJ states that the treating physicians' opinions "were not consistent with objective medical evidence" of record, he fails to point to any medical evidence that is actually inconsistent with their opinions. The examination by Dr. Budzenski in 2007 confirmed that Maske exhibited "pain behaviors" and had limited range of motion in her cervical and dorsolumbar spine and left shoulder. Maske's eleven-day hospitalization in 2007 also supports the statements by Drs. Twanow and Perona regarding the debilitating nature of the impairments she suffers. Tests taken during that hospitalization "revealed the L5-S1 level to have a severe bilateral neuroforaminal narrowing of invertebral disc space," which was "in addition to the degenerative disc diseases from L2-3 through L5-S1 shown in the MRI taken a year earlier." However, instead of discussing this evidence in determining the weight to give the opinions of Drs. Twanow and Perona, or any evidence that is inconsistent with their medical opinions, the ALJ discusses how Maske failed to engage in meaningful rehabilitation and never made a consistent effort to lose weight despite being advised to by her treating physicians. While these may be grounds for not finding Maske's complaints credible, the Court does not believe they adequately justify discounting the opinions of Drs. Twanow and Perona.

Seeking to avoid this result, the Commissioner argues that the opinions of the state agency physicians, all of whom concluded that Maske could perform light exertional work with certain limitations, contradicted those of Drs. Twanow and Perona. The Commissioner is correct that the ultimate opinions of Drs. Twanow and Perona that Maske was "disabled" were inconsistent with those of the state agency physicians. This does not mean, however, that the opinions of Drs. Twanow and Perona about the nature and severity of Maske's impairments and the symptoms she suffers were inconsistent with the medical evidence, and the ALJ fails to point

18

to any specific medical evidence to justify discounting those opinions. Again, an ALJ must give "good reasons" for discounting the opinion of a treating physician, *Scott*, 647 F.3d at 739, and the ALJ's conclusory reasons for discounting the opinions of Drs. Twanow and Perona do not meet that standard.

The ALJ also erred in his cursory treatment of the opinions of Drs. Twanow and Perona by failing to determine the weight to be accorded to these opinions. Even when there is a sound reason for not giving a treating physician's assessment controlling weight, an ALJ is still required to determine what value the assessment did merit. *See* 20 C.F.R. § 404.1527; *Scott*, 647 F.3d at 740. This means that the ALJ must consider "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740 (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)). Here, many of these factors weigh in favor of giving substantial weight to the opinions of Dr. Twanow, who treated Maske for over ten years, and Dr. Perona, an orthopedic surgeon who performed surgery on Maske's shoulder and treated her for at least five years. The ALJ did not consider these factors, however, and therefore failed to apply the correct legal standard and support his decision with substantial evidence. *See Moss*, 555 F.3d at 561 (remanding case where ALJ failed to consider the factors outlined in 20 C.F.R. § 404.1527).

This is not to say that the ALJ did not discuss the medical evidence in the case. To the contrary, he provided an extensive summary of the medical evidence, as well as Maske's testimony at the hearing. Nevertheless, he failed to provide the "narrative discussion describing how the evidence supports each conclusion" he arrived at in determining Maske's RFC. *See* SSR

19

96-8p; *see also Briscoe*, 425 F.3d at 352. This is particularly true as to his conclusion that Maske could occasionally use her left upper extremity to do overhead work, even after discussing that the doctors who physically examined her stated that she should not use her left upper extremity at all for overhead work. Because the ALJ simply recited the evidence in the record before summarily reaching his conclusion as to Maske's RFC, the Court is not able to "trace the path of [the ALJ's] reasoning," and a remand is necessary.

## II.     The ALJ's credibility determination

Maske next argues that the ALJ erred in finding that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (R. 17, Pls.'s Mem. at 13.) SSR 96-7p provides a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain. SSR 96-7p, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34484-85 (July 2, 1996) (hereinafter SSR 96-7p). First, an ALJ "must consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p, 61 Fed. Reg. at 34484; *Scheck*, 357 F.3d at 701. Second, once "this has been established, the ALJ must further evaluate the 'intensity, persistence, and functionally limiting effects of the symptoms' in order to find whether those symptoms 'affect the individual's ability to do basic work activities.'" *Scheck*, 357 F.3d at 701 (quoting SSR 96-7p, 61 Fed. Reg. at 34485). If an "individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," SSR 96-7p, 61 Fed. Reg. at 34485, the ALJ must make a finding on the credibility of the statements based on a

20

consideration of "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p, 61 Fed. Reg. at 34484; *see also Scheck*, 357 F.3d at 701. Additionally, under SSR 96-7p an ALJ may consider his own "observations of the individual as part of the overall evaluation of the credibility of the individual's statements" in instances where an individual attends an administrative proceeding. SSR 96-7p, 61 Fed. Reg. at 34486.

Because an "ALJ is in the best position to determine the credibility of witnesses," this Court reviews that determination "deferentially," and will overturn a credibility determination "only if it is patently wrong." *Craft*, 539 F.3d at 678; *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (noting that an "ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying"). The credibility determination "must contain specific reasons for the credibility finding." *Craft*, 539 F.3d at 678. Additionally, an ALJ is precluded "from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005). While an ALJ may not discredit a claimant's testimony about his pain and limitations solely because they are not supported by objective medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration. *See Jones*, 623 F.3d at 1157 (ALJ's decision that claimant exaggerated

21

her allegations of disabling pain was not patently wrong where the objective medical evidence consistently revealed that claimant's condition was benign).

Here, the ALJ concluded that the objective medical evidence indicated that Maske's impairments could reasonably be expected to cause her alleged symptoms. Nevertheless, using language the Seventh Circuit has called "even worse" than "meaningless boilerplate," the ALJ concluded that Maske's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *See Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) ("[D]oubts about credibility [are] critical to [the] assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility.") (citations omitted); *see also Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) ("This is precisely the kind of conclusory determination SSR 96-7p prohibits. Indeed, the apparently post-hoc statement turns the credibility determination process on its head by finding statements that support the credibility ruling and rejecting those statements that do not."). Although the use of this language alone does not warrant remand, *see Richison v. Astrue*, No. 11-2274, 2012 WL 377674, at *3 (7th Cir. Feb. 7, 2012), remand is appropriate here because the ALJ's remaining credibility analysis fails to build the required logical bridge between the evidence and the conclusion that her testimony was not credible.

Although the specific grounds for his credibility determination are not clear, the Court surmises from the ALJ's discussion of Maske's testimony that he based his conclusion on Maske's ability to complete some household tasks despite her claims of pain and fatigue, Maske's failure to obtain follow-up treatment for her pain, and inconsistent statements she made

22

during her hearing testimony. Although these can be permissible grounds for an adverse credibility finding, the ALJ here failed to fully explore the bases for his determination as required by the Social Security Rulings.

First, "where the claimant does not have a good reason for the failure or infrequency of the treatment," failure to follow a treatment plan can support an ALJ's determination that a claimant was not credible. *Craft*, 539 F.3d at 679 (citing SSR 96-7p). Importantly, though, no such inference can be made "unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Id.* Here, in determining that Maske's testimony was not credible, the ALJ repeatedly referenced Maske's failure to obtain follow-up treatment or take pain medication. However, he ignored Maske's testimony that she has experienced life threatening side effects from some medications, and that her medical records include numerous references to the negative effects she experienced on pain killers and other medications. The ALJ also failed to inquire about those side effects and their impact on her failure to obtain treatment regarding her pain. Instead, when Maske testified that she did not have any side effects at the time of the hearing because she was not currently on pain medication, the ALJ abruptly changed topics, and later used Maske's testimony as evidence of the inconsistency of her testimony. This testimony, however, is far from inconsistent. That Maske chose to forego pain medication due to the possibility of an allergic reaction is consistent with her medical records, which the ALJ does not mention. Because he did not seek an explanation for why Maske did not pursue certain treatments, the ALJ should not have drawn any inferences regarding Maske's condition or credibility. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (holding that the ALJ had an "obligation to consider [the claimant's] explanation for her failure to seek surgery before

23

drawing an adverse inference"). Thus, remand is necessary in order for the ALJ to further inquire about Maske's failure to obtain treatment for her pain before he can use that lapse as a ground for an adverse credibility determination. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("Inability to pay for medication or negative side effects from medication may excuse failure to pursue treatment.") (citing SSR 96-7p).

The Court is also troubled by the weight the ALJ placed on Maske's ability to complete household activities in assessing her credibility and her ability to work outside the home. While an ALJ can appropriately consider a claimant's daily activities when assessing the claimant's symptoms, *Craft*, 539 F.3d at 680, an ALJ "cannot disregard a claimant's limitations in performing household activities." *Moss*, 555 F.3d at 562 (citations omitted). Although the ALJ provided an exhaustive summary of Maske's testimony regarding her activities of daily living, when the ALJ discussed his credibility finding, he disregarded Maske's testimony that when she does the dishes, she leans on the sink with her stomach to relieve the pressure on her legs and back, and even in this position, needs to rest every few minutes. The ALJ also ignored Maske's testimony that she folds laundry while seated, and that she must take her time doing so. Given these limitations on how she completes household tasks, her testimony that she occasionally does the dishes and folds the laundry is not inconsistent with her claims that she suffers chronic pain and fatigue.[5]

In sum, in light of the ALJ's questionable treatment of the opinions of Maske's treating

---

[5]   Additionally, the Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft*, 539 F.3d at 680. Accordingly, on remand the ALJ should consider any testimony by Maske regarding how she copes with her daily activities in his RFC assessment unless he finds such testimony incredible. *Id.*

physicians and his failure to build a logical bridge between the evidence and his credibility determination, his conclusion that Maske is not disabled is not supported by substantial evidence. Although the record does not command a determination that Maske should be awarded benefits, a remand is warranted because the ALJ has not adequately supported his conclusions.[6]

## CONCLUSION

For the foregoing reasons, Maske's motion for summary judgment (R. 16) is GRANTED. This case is remanded for further administrative proceedings consistent with this opinion pursuant to 42 U.S.C. § 405(g).

Entered:

Judge Ruben Castillo
United States District Court

Dated: May 31, 2012

---

[6] Because the Court grants Maske's motion based on her first two arguments, the Court does not address her final argument regarding whether the ALJ erred in his questioning of the vocational expert because his questions failed to reflect Maske's restrictions regarding pain, her neck and spine movement, and standing and sitting. Additionally, the Commissioner is correct that these arguments largely challenge the ALJ's RFC determination, which will be reevaluated on remand.